**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 29, 2016**

# In the Court of Appeals of Georgia

A16A0473. GRAHAM v. THE STATE.

BOGGS, Judge.

A jury found Joe Alan Graham guilty of theft by taking. Following the denial of his amended motion for new trial, Graham appeals, challenging the sufficiency of the evidence, the admission of similar acts, and asserting that his trial counsel was ineffective. We discern no error and affirm.

1. Graham first challenges the sufficiency of the evidence. When we review the sufficiency of the evidence,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

> Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnote omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the evidence showed that the victim searched Craigslist to find a cabinet maker to replace her kitchen cabinets. She saw Graham's advertisement as a "semi-retired cabinet maker" and made contact with him. Graham presented the victim with some cabinet samples, and the victim contacted the references provided by Graham and also verified the lumber company Graham used to build cabinets. The victim was "still uncomfortable" about "proceed[ing] forward" and requested to visit Graham's workshop. The victim and her friend visited the workshop and Graham showed them "work in progress for his other clients."

Graham and the victim agreed to a payment of three installments for the cabinets: "The first installment for down payment [Graham] said to obtain the material. The second install was for when he's finished the box, the boxes. And the third and final installment at installation." The contract, signed by the parties on September 29, 2011, listed a total price of $7,000, and a delivery date within "4 to 5

2

weeks." The agreement provided that Graham would build 36-inch lower cabinets and 32-inch upper cabinets. The victim gave Graham a $2,800 down payment for the cabinets, Graham came to her home to measure, and they agreed that Graham would build 32-inch cabinets.

On October 14, Graham sent the victim draft drawings of the cabinets by email. After some "back and forth because [she] had questions about some of the layout," Graham asked the victim to confirm measurements, but the victim told him to "come back and redo the measurement himself." Graham emailed the victim pictures of "the boxes" as proof of him having completed them and asked for the second installment payment. Graham told her there was a 6-inch "discrepancy between what he had written on the contract versus my full length of the cabinet," and that he needed additional materials. He and the victim "went back and forth," but she ultimately agreed to pay him an additional $350 at installation because she felt partly responsible for the discrepancy in the measurements. On November 1, the victim paid Graham the second $2,800 installment.

On November 10, Graham called the victim and told her that he "talked to the manufacturer and they're willing to discount the doors to me and I can give it to you for $150. But I will need to give them a deposit today so you need to send me the

3

money . . . . he told me that if I wire it to him, I can go to MoneyGra[ ]m Wal-Mart and wire it to him." The victim sent Graham the money requested.

Graham and the victim exchanged several emails and phone calls concerning the cabinets. After November 11, however, "he stopped responding" and the victim did not receive any communication from Graham until November 23, when she received a handwritten letter from Graham informing her that he would be unable to work on the cabinets until January. But in December, Graham informed the victim that he was "now available to resume [her] job," but needed more money because the price of materials had increased in the interim. The victim refused to pay Graham any additional money to build the cabinets and he again stopped communicating. On January 12, 2012, Graham emailed the victim a "proposal to finish [her] kitchen." He was "proposing to deduct his expenses for the extra work that he's done and leave me a balance of $1,420 which I can feel free to apply towards another kitchen." The victim and Graham exchanged several emails about how he arrived at this amount, and they scheduled a meeting to discuss the matter further, but Graham cancelled.

On February 22, Graham emailed the victim that he would complete the cabinets "as soon as possible when he's feeling better." The two scheduled another meeting for February 26, but Graham cancelled again. The two finally met on March

4

and Graham told the victim that it would cost an additional $7,200 to complete her kitchen because he had to take apart the first set of boxes he built for her. When the victim refused to pay Graham another $7,200, which was nearly double the price they had agreed upon initially, Graham invited her to "visit the magistrate court down the street from his house and file [her] civil case against him." As of the date of trial, the victim did not receive the cabinets, was never "able in person to see any constructed cabinets for [her] home," and had not received any money back from Graham.

Graham testified in his own defense that he did not begin working on the construction of the boxes until October 2011 or "two to three weeks from the initial signing of the contract" because he had a difficult time getting the victim to approve the drawings and needed an additional measurement. He claimed that after he had already built the boxes for the upper cabinets, the victim "changed her mind on the original size she wanted" and wanted larger cabinets. Graham explained that after several emails and calls concerning the changes the victim requested, they met and he told her that he would have to charge her extra for the rebuild of the cabinets. He claimed that he took apart the boxes he had constructed at the victim's request because she "changed the whole kitchen at that point. She wanted it all rearranged differently." Graham denied telling the victim that the cost would be an extra $7,200,

but explained that he told her "the difference was only $4,400." He testified that after the victim refused to negotiate any further, she filed a civil suit and was awarded the amount "she had paid [Graham] which was like $5,600." Graham did not respond on cross-examination when he was asked, "when did you offer to give her the wood and the materials?" He asserted that he did not owe the victim any money because he "did what [he] told her [he] would do and that she signed a contract for."

The State also presented two similar act witnesses who testified that they also located Graham on Craigslist and hired him to make cabinets. Both witnesses testified that they paid Graham money but never received completed cabinets nor a refund of their money.

Graham testified that with regard to the first similar act witness, his work to complete the cabinets was delayed because the witness' husband was ill. He stated further that he had offered to "bring the base cabinets out and set them." And with regard to the second similar act witness, Graham asserted that this witness "breached the contract. I do owe him money. I owe him back 500 and some dollars." He testified that he did not "plan to take any money away from these people without doing the work," and "never intended to defraud them."

Graham argues that the facts show merely "a civil matter" and that there was "no criminal intent by [him] to take [the victim's] money and not make the cabinets she had ordered." OCGA § 16-8-2 provides that "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." The evidence presented here showed that Graham accepted money from the victim for the purpose of constructing cabinets, did not complete the cabinets or provide the victim with what had been completed, and failed to return any money to the victim. "Under these circumstances, the jury was authorized to infer that [Graham] acted with fraudulent intent and to find him guilty of theft by taking." (Citations omitted.) *Bearden v. State*, 316 Ga. App. 721, 724 (1) (728 SE2d 874) (2012) (evidence sufficient to support theft by taking when defendant received money to construct modular homes but shortly thereafter abandoned the projects and failed to return funds to victims); see also *Smith v. State*, 265 Ga. App. 57, 59 (1) (592 SE2d 871) (2004) (evidence sufficient to support charge of theft by taking when defendant abandoned project and failed to return the unearned portion of down payment after promising to do so).

7

2. Graham argues that the trial court erred in admitting evidence of the two similar acts. The State sought to admit the evidence pursuant to OCGA § 24-4-404 (b) to show Graham's intent, knowledge, and plan, and the trial court allowed the similar acts for these purposes. The court determined that the similar acts were "relevant to an issue other than the defendant's character," the probative value was "not substantially outweighed by the undue prejudice that the evidence might elicit," and there was "sufficient proof for a jury to establish or find that the defendant was the person that committed the independent or other acts."

OCGA § 24-4-404 (b) provides:

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

And

[i]n determining the admissibility of "other acts" evidence, this Court has adopted the Eleventh Circuit's three-part test for admissibility under Federal Rule of Evidence 404 (b) which requires that the admitting court find (1) the evidence is relevant to an issue in the case other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice, and (3) there is sufficient proof for a

8

jury to find by a preponderance of the evidence that the defendant committed the prior act. When weighing the probative value of other acts evidence against its prejudicial effect, Georgia courts apply the balancing test set forth in OCGA § 24-4-403,[1]which similarly tracks its federal counterpart.

(Citations omitted.) *Brannon v. State*, 298 Ga. 601, 606 (4) (783 SE2d 642) (2016). On appeal, we review the trial court's ruling admitting evidence pursuant to OCGA § 24-4-404 (b) "for a clear abuse of discretion, a review requiring the appellate court to make a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." (Citation and punctuation omitted.) Id.

Graham argues that the other two acts were more prejudicial than probative because the circumstances of those acts were different. He argues that the first witness "was unhappy with the quality of the work and wanted her money back," while the second witness "was unhappy with the time it was taking for Graham to

---

[1]This Code section provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

complete the work and [wanted] to cancel his contract because of some missed appointments."

Without question, "intent was put in issue by [Graham] entering a plea of not guilty." *Olds v. State*, ___ Ga. ___, slip op. at 14 (2) (Case No. S15G1610; decided May 23, 2016). And, as Graham concedes, "the issue of intent was very important to [his] defense." Graham's counsel argued at trial that Graham had no intent to deprive the victim of her property. Evidence of these other acts, which involved the same sort of intent as required to prove the theft here and had a tendency to prove such intent, were relevant and satisfied the first requirement for admission. See id., slip op. at 13, 20-22 (2). Moreover, the evidence had a "greater . . . tendency to make the existence of" Graham's intent more probable. See id., slip of at 21-22. Contrary to his argument on appeal, the year-and-a-half span in which the similar acts and charged act occurred, see *Brannon*, supra, 298 Ga. at 606 (4) (assessment of circumstances includes temporal remoteness), and "the similarity between the crimes and the facts relating thereto make the former act[s] highly probative of [Graham's] intent." (Citation and punctuation omitted.) *McCoy v. State*, 332 Ga. App. 626, 629 (774 SE2d 179) (2015).

10

In light of the quality of this evidence and the strength of its logical connection to establishing Graham's intent, we are satisfied that the trial court did not abuse its discretion in determining that the probative value of the similar acts was not outweighed by their prejudicial effect. See *Olds*, supra, slip op. at 21-23. Finally, we hold that the third element is satisfied because the testimony of the similar act witnesses and the testimony of Graham was sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the prior acts.

For these reasons, we hold that the trial court did not abuse its discretion in allowing the admission of these similar acts.[2]

3. Graham argues that his trial counsel was ineffective in failing to investigate or present at trial other witnesses, whose names Graham provided, to show that he "was a legitimate cabinet maker."

> To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was professionally deficient and that but for such deficient performance there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668, 685, 695 (104 SCt 2052, 80 LE2d 674) (1984). To prove

---

[2]Because the similar act evidence was admissible to prove intent "we need not determine whether it was also admissible to show [knowledge] and plan." *Anthony v. State*, 298 Ga. 827, 832 (4) n.3 (___ SE2d ___) (2016).

deficient performance, one must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. If the defendant fails to satisfy either the "deficient performance" or the "prejudice" prong of the *Strickland* test, this Court is not required to examine the other.

(Citations and punctuation omitted.) *Franklin v. State*, 298 Ga. 636, 638 (2) (784 SE2d 359) (2016).

At the motion for new trial hearing, Graham explained that he had given trial counsel the names of other customers who would have testified that he had satisfactorily completed their cabinets. But Graham "did not proffer any uncalled witness to testify at the hearing or otherwise proffer a legally recognized substitute for such testimony. In the absence of such evidence, appellant cannot prevail on the prejudice prong of his ineffective assistance claim, and we need not reach the deficiency prong." (Citations omitted.) *Barge v. State*, 294 Ga. 567, 569 (2) (755 SE2d 166) (2014); see *Curtis v. State*, 330 Ga. App. 839, 842 (1) (b) (769 SE2d 580) (2015) (where "'the defendant fails to proffer the testimony of an uncalled witness, he cannot prove that there is a reasonable probability that the trial would have ended differently'"[Cits.]). The trial court therefore did not err in denying Graham's motion for new trial on the basis of ineffective assistance of counsel.

12

*Judgment affirmed. Barnes, P. J., and Rickman, J., concur.*