**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 1, 2016**

# In the Court of Appeals of Georgia

A16A1252. PARKER v. THE STATE.

BOGGS, Judge.

A jury found Daireem Parker guilty on two counts of armed robbery, two counts of aggravated assault, and one count each of aggravated battery and possession of a firearm during the commission of a felony. Following the denial of his amended motion for new trial, Parker appeals, asserting that the trial court erred in finding he opened the door to character evidence and in limiting his explanation of a prior criminal charge. He also argues that he received ineffective assistance of trial counsel. For the following reasons, we affirm.

Construed in favor of the verdict, the evidence showed that a woman and her boyfriend were walking from the parking deck to their apartment around 2:00 a.m. when "two guys with guns" approached them and asked them for their cellphones.

She testified that the first man did most of the talking. The female victim handed the men her phone, and her boyfriend told them he did not have a phone, but complied when the men pulled out guns.

The two men then told the couple that they "were going to walk to the elevator." As they did so, the men pointed guns to the victims' heads. The female victim attempted to engage the first man in conversation, but he told her to "shut the f**k up before I kill you." When they arrived at the elevator, the first man forced the female victim to give her purse to two other men who appeared and entered the elevator with the four of them. One of them was carrying a crowbar. The two other men went through her purse finding six dollars and her debit card and asked her how much money she had in her bank account. After they arrived at the first floor, the first man told the victims that they "were going to walk to the exit, the visitor's exit," but when he saw "something and got scared," he told them they were going to take him to their apartment. When the female victim told the first man, "I can't do that," and the boyfriend told him "there was no way that was going to happen," he hit the female victim across the face with the gun causing it to fire. At the same time, the boyfriend was hit in the back of the head although he could not tell which of the four men hit him, and he did not witness his girlfriend being hit in the face because he blacked out

for "a minute or two." The female victim witnessed her boyfriend fall in front of her, and the four men then ran in the opposite direction. The female victim believed that her boyfriend "got shot, but later on we found out that he was hit on the back of the head by the crowbar."[1]

When the men fled, the victims ran out of the visitor's door and the female victim screamed for help. When she could get no one at the apartment complex to let them in, they ran to a nearby gas station where the female victim saw three of the assailants in "a creamish van; SUV," and the first man in "a blue Ford with his headlights off, driving behind them." When she saw the men, she pushed her boyfriend "into the bushes and I got on top of him. And then [the first man] drove off." She described the vehicle the first man was driving as a "blue Ford Taurus with, like, a small spoiler."

Detectives were able to identify a vehicle matching this description on surveillance video and retrieved the tag number. They discovered that the vehicle was registered to Parker's mother, who told officers and testified at trial that Parker and

---

[1]The female victim suffered a broken jaw and a hemorrhage in her right eye, and two of her teeth were knocked out. She received stitches in her eye and has a permanent scar on her lip. The boyfriend received stitches to the back of his head and has a permanent scar.

her other son "are primarily the other people that use the vehicle." Parker's mother "named a person named Black also uses the car," but officers "never identified who Black was." She explained at trial that there were others who drove her car, but she didn't "know their names. I don't even know their nicknames."

Officers created two photo lineups. Lineup A included a picture of Parker (as picture #1), and Lineup B included a picture of his brother (as picture #2). The boyfriend could not positively identify anyone in either lineup: "I think [ ] [L]ineup [B], I saw someone that looked like it could have been one of the guys, but then in [Lineup A], I didn't, right off the bat no. And I didn't want to just pick some random person." He explained further that in Lineup B, after a few minutes, he chose photograph #4 "because he looked like he could have been one of the guys that was there," but that he told officers that he "was not a hundred percent sure." With regard to Lineup A, that included the photograph of Parker, the boyfriend could not "recognize anybody right off" and was unable to pick anyone out of the lineup.

When shown Lineup B with Parker's brother, the female victim could not readily identify anyone. She chose #4 as "look[ing] familiar; he could have been there," but she was not certain. When shown Lineup A containing the picture of Parker, the female victim chose Parker immediately, "started crying and shaking, and

4

backed away from the photo." She testified that it only took her "one second" to identify Parker from the lineup and that she was certain he was the first man out of the four who robbed her. Both victims identified Parker at trial as the first man they encountered and the female victim identified him at trial as the one who hit her with the gun.

After obtaining a warrant for Parker's arrest, an officer obtained information that he had an appointment at a certain location. Officers arrived at the location, observed Parker arrive in his mother's blue Ford Taurus, and approached him while he was inside the location, waiting in line. An officer showed Parker his badge and explained that he had a warrant for his arrest, and officers escorted him outside to a patrol car after handcuffing him. As an officer was reading the charges to Parker, "out of the corner of [his] eye, [he] saw [Parker] make a quick move like this to the left. He unlocked the - - - he unlocked the door and stuck his leg out, and was trying to jump out of the car while it was rolling at a slow pace." An officer grabbed Parker, Parker "knocked [his] arms off" and "was able to get out of the vehicle and he fled with his hands behind his back." The officer gave chase and repeatedly ordered Parker to "get on the ground." Parker ignored the officer's commands, but the officer grabbed him and forced him to the ground.

A detective testified that both victims' earlier descriptions of three of the four men were consistent with one another. Parker's height and weight was also consistent with the victims' description. The victims were not able to make any other identifications, and no other suspects were ever identified or arrested.

Parker testified in his own defense that he did not rob and assault the victims, that he had never been to the apartment complex, and that he and his brother both had friends who also drove his mother's blue Ford Taurus. Parker explained that he fled after he was placed in handcuffs because he thought he was "being kidnapped." He testified that he initially assumed that the men who approached him were police, but when they put him in the car, he "didn't think they were the police." Parker explained that he "started to get kind of scared" when he saw the police vehicle because it was an older model car and was really dirty with "dirty clothes on the back seat . . . [and] old french fries on the floor." He explained further that because the officers wore plain clothes, put the handcuffs on him "really, really tight," did not lock the door when they put him in, and "didn't go through any kind of police procedure" or tell him why he was being arrested, he believed he was being kidnapped.

1. Parker first asserts that the trial court erred in finding that he opened the door to character evidence, and that the State improperly impeached him pursuant to

6

OCGA § 24-6-609 because he was only convicted of misdemeanors. Although the parties argue that the issue is one of opening the door to character evidence, our examination of what transpired at trial reveals that the issue is more properly characterized as impeachment by disproving a fact. OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness.") In either case, we review the court's ruling on this issue for an abuse of discretion. See, e. g., *Arnold v. State*, 305 Ga. App. 45, 51 (4) (699 SE2d 77) (2010).

During direct examination, Parker's trial counsel asked him if there was any other person he would have allowed to drive his mother's car. Parker responded that there were times where the car had "been gone two, three days . . . my mom and me . . . had to go pick the car up . . . and drive the car back to the house." Trial counsel then asked Parker, "So you . . . don't know nothing about this crime?" Parker responded:

> No. I have no idea about the crime. When those people - - when the people came in there and said that they - - they - - they're a hundred percent sure that it's me; like looking at them in the eye and the severity of the situation, like - - like I - - I haven't been in no situation like this. This is a lot. And, so, for somebody that you've never seen before to just look at - - to look at you and tell you in your face, I can't even - - I can't

7

> - - I can't explain the feeling. I cannot explain the feeling to you, like, how - - how terrified you get when you - -.

The State then objected, and outside of the presence of the jury, asserted that Parker had opened the door to his character by stating that "he has never been in trouble before, which is not the case." The State argued that Parker's prior charge and conviction that included the offense of family violence battery, "goes directly in the face of his statement and that the State should be allowed to go into all of that at this time." Parker countered that he did not open the door to his character but rather meant that he had never been "falsely accused of - - robbing and kidnapping people."

The trial court agreed with the State finding that Parker "clearly opened the door" :

> So I think I'm going to allow that to come in. I'm going to allow it to come in that he was charged with an aggravated assault for which he pled to a family violence battery. That I will allow in, because I think it goes to the fact that his testimony was, I've never been in this situation. What is this situation? This situation here is an aggravated assault. He has been in a situation like this, which was, in fact, an aggravated assault, so I'm going to allow that in.

Parker's statement that he had never "been in no situation like this," "situation" could have been interpreted to refer to a charge of aggravated assault, or even more

broadly, facing criminal charges. And it was within the trial court's discretion to determine whether the jury might have interpreted his testimony in this manner. *Holloman v. State*, 291 Ga. 338, 342 (5) (729 SE2d 344) (2012) (it was within trial court's discretion to determine whether jury might have interpreted defendant's testimony, that he "got convicted once of possession of cocaine," as implying he had only one previous encounter with the law). As the trial court ruled, the State was therefore allowed to disprove the fact Parker testified to by impeaching him with his prior charge for aggravated assault, even though that charge resulted in a conviction on a lesser offense. See OCGA § 24-6-621; see also *Harris v. State*, 333 Ga. App. 118, 121 (2) (775 SE2d 602) (2015) (where defendant stated that "he had 'never done nothing like that' either before or since" having engaged in sexual relations with witness when she was 14 years old, trial court did not abuse its discretion in allowing him to be impeached to disprove that fact with evidence that he had in fact engaged in improper sexual contact with another minor girl). We therefore find no merit in this claim of error.

2. Parker contends that the trial court erred in sustaining the State's objection to his explanation of "what the prior charges were for." On cross-examination, Parker admitted that three years earlier he had been charged with aggravated assault, family

9

violence battery, and cruelty to children, but pleaded guilty to misdemeanor family violence battery, reckless conduct, and cruelty to children. Later during redirect, Parker's counsel asked him who was involved in the incident that resulted in the charge of misdemeanor family violence battery. Parker responded, "My - - the mother of my kids," when the State objected that such explanation was not relevant. The trial court agreed and sustained the objection.

Parker cites *Davis v. State*, 209 Ga. App. 755 (434 SE2d 752) (1993), in support of his argument that he should have been allowed to explain the circumstances of the charges. In *Davis*, we held that an officer's brief passing reference to a prior arrest fell short of putting the defendant's character in issue, but that it was error not to allow the appellant to cross-examine the officer about the circumstances of that arrest. Id. at 759 (3). We concluded, however, that any error was harmless. Id.

Here, in contrast, the trial court ruled that Parker opened the door to evidence that he had a previous charge for aggravated assault after he testified that he "had never "been in no situation like this." The prior charge and conviction were therefore admissible to disprove his statement, as allowed by OCGA § 24-6-621: "A witness may be impeached by disproving the facts testified to by the witness." And "[t]he test

10

on deciding the scope of redirect is whether the court abused its discretion." (Citation and punctuation omitted.) *Speed v. State*, 270 Ga. 688, 693 (18) (512 SE2d 896) (1999). Because the prior charge and conviction were admitted for the purpose of disproving a fact, we cannot say that the trial court abused its discretion in not allowing Parker to present evidence about the circumstances of the crime, as opposed to an explanation of why his direct testimony was not inconsistent with the fact of his conviction, which Parker did without objection.[2] See *Williams v. State*, 171 Ga. App. 927, 928 (2) (321 SE2d 423) (1984) (evidence of prior juvenile arrests admissible for impeachment pursuant to predecessor to OCGA § 24-6-621 after defendant testified that he had never before been in any kind of trouble); compare *Lindsey v. State*, 282 Ga. 447, 448-450 (2) (651 SE2d 66) (2007) (introduction of arrest record improper method of impeachment where defendant stated that he had never been convicted of a *felony*).

---

[2]Although at one point the court misstated that Parker opened the door to character, it is clear the court ruled Parker opened the door to evidence to disprove that he had, as the court stated, "never been in this situation. What is this situation? The situation here is aggravated assault. He has been in a situation like this. . . ." And the trial court in its order on the motion to new trial explained further that Parker was properly impeached pursuant to OCGA § 24-6-621 (impeachment by contradiction).

3. Parker argues that this trial counsel was ineffective in failing to object to the State's closing argument.

> To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was professionally deficient and that but for such deficient performance there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668, 685, 695 (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, one must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. If the defendant fails to satisfy either the "deficient performance" or the "prejudice" prong of the *Strickland* test, this Court is not required to examine the other.

(Citation and punctuation omitted.) *Graham v. State*, 337 Ga. App. 664, 670 (3) (788 SE2d 555) (2016). "Further, although both the performance and prejudice components of an ineffectiveness inquiry involve mixed questions of law and fact, a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous." (Citation omitted.) *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015).

In closing, the prosecutor argued:

He's not new to this rodeo. He's been arrested before, for the same crime, aggravated assault. And not only has he been arrested before, he's

12

been convicted of the violent crime of family violence battery and cruelty to children in the third degree, not one count but two counts. And in fact he had just been convicted, just a month earlier, on March 22nd of 2011, 30 days prior to when he committed this offense. Do you believe that somebody who's been convicted of those crimes is not capable of committing this offense? Is not capable of holding somebody, not one but two people up at gunpoint? Do you think that somebody who's committed that prior offense is not capable of talking to his friends and planning a robbery in an apartment building on two unknowing victims, two strangers late at night, when they hope they can get away with it because nobody else is around? No. Folks, this is not his first rodeo. He is not the innocent boy that he wants you to believe he is.

Parker argues that this was an impermissible argument on his propensity to commit the crimes when the evidence of the prior charge and conviction were only introduced for purposes of impeachment.

At the hearing on the motion for new trial, when asked about her failure to object at closing, defense counsel responded that there was no strategic reason not to object: "It got past me. I should've objected." But counsel later acknowledged that if she had objected it would have "brought more attention to those charges than had [she] just let the argument go." But even if counsel had asserted that her failure to object was strategic, the Georgia Supreme Court has held that where a prior

13

conviction is used to impeach the defendant, it is not a reasonable trial strategy to "permit the assistant district attorney to argue to the jury that appellant's prior convictions . . . established appellant had a propensity to commit crime." *Phillips v. State*, 285 Ga. 213, 220 (5) (b) (675 SE2d 1) (2009). The court explained that evidence of a similar transaction may be admissible to show that a defendant has a "tendency or propensity to react to similar conditions in a similar way,"[3] Id. at 219 (5) (b), but when a prior conviction is admitted to attack the defendant's credibility, "the conviction's purpose is limited to an attack on the defendant's credibility and, unless the prior conviction also is admitted as a prior similar transaction, it is impermissible to use the prior conviction to establish the defendant as a bad person with a propensity for crime." Id. at 219-220 (5) (b).

Here, evidence of Parker's previous charge and conviction was admitted to attack his credibility by disproving facts to which he testified.[4] See OCGA § 24-6-

[3]Our Evidence Code has since been revised to allow evidence of other crimes, wrongs, or acts to prove, among other things, motive, opportunity, intent, and preparation, but to prohibit evidence that an accused has a propensity to commit a crime. See *Brannon v. State*, 298 Ga. 601, 606 (4) (783 SE2d 642) (2016); OCGA § 24-4-404 (b).

[4]Parker did not request a limiting instruction after the trial court determined that he could be impeached with the prior charge and conviction. See *State v. Byrd*, 255 Ga. 665, 668 (341 SE2d 455) (1986) ("reasonable and proper to insist upon a

14

621. This evidence was not admitted as evidence of other acts (formerly "similar transactions") pursuant to OCGA § 24-4-404 (b). Even if it had been admitted for such a purpose, it could not be used to show his propensity to commit a crime. See *Brannon*, supra, 298 Ga. at 606 (4). The State therefore could not argue that this evidence showed that Parker had a propensity to commit aggravated assault here, and trial counsel was ineffective in failing to object to this portion of the prosecutor's closing statements. See *Phillips*, supra, 285 Ga. at 220 (5) (b).

Under these circumstances, we must now determine whether there is a reasonable probability that the result of trial would have been different had counsel objected. As explained in *Strickland*, supra, 466 U. S. at 695 (III) (B), "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable

---

request by a defendant who wishes to have the trial judge give limiting instructions for impeachment evidence used in the mode of disproving facts testified to"). But the court instructed the jury as follows at the close of evidence:

> To impeach a witness is to show that witness is unworthy of belief. A witness may be impeached by disproving the facts to which the witness testified or the credibility of a witness may be attacked by disproving the facts to which the witness testified . . . you may determine whether there was evidence that a witness testified falsely about an important fact during the course of the trial as opposed to some other time before this trial.

15

probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Here we cannot say that there was such a probability in the face of counsel's error. The jury heard evidence of Parker's prior charge and conviction without the benefit of a limiting instruction, and it is the prior charge and conviction itself, the evidence used to impeach Parker, that weighs on his credibility.[5] The evidence was sufficient to sustain Parker's conviction, and by no means was the verdict only weakly supported by the record such that it was more likely than not to have been affected by the error. See id. at 696 (III) (B). The female victim's identification of Parker in the lineup was immediate and unequivocal, he was one of two primary drivers for the vehicle seen leaving the scene, and the victims did not identify any other primary driver in a lineup.

While we have often held that a defendant fails to satisfy the second prong of *Strickland* where the evidence is overwhelming, strong evidence of guilt can also support the conclusion that no reasonable probability of a different outcome exists.

---

[5]We note that Parker does not assert the trial court erred in failing to sua sponte give a limiting instruction for the admission of his prior charge and conviction, nor does he assert that his trial counsel was ineffective in failing to request one. In the absence of an instruction of how to properly consider this evidence, the jury had the freedom to consider it for any purpose, including the purpose of disproving Parker's statement that he had never "been in no situation like this."

16

See *Whitaker v. State*, 291 Ga. 139, 142 (2) (728 SE2d 209) (2012) (where strong evidence against defendant, no reasonable probability that outcome of trial would have been different had counsel objected); *Henry v. State*, 316 Ga. App. 132, 136 (7) (729 SE2d 429) (2012) (same). We therefore hold that Parker's ineffective assistance claim fails as he has not shown a reasonable probability that the outcome of the trial would have been different had counsel objected to the State's closing argument. See, e. g., *Herrington v. State*, 332 Ga. App. 828, 830-833 (2) (775 SE2d 195) (2015) (no reasonable probability that outcome of trial would have been different had counsel objected to evidence of two prior false information convictions).

*Judgment affirmed. Barnes, P. J., and Rickman, J., concur*.